Thank you, Your Honor. The next case for argument is Hunley v. Instagram. Good morning, Your Honor. Solomon Serra appearing for the appellants and the plaintiffs in the underlying action. Your Honor, this appeal concerns one issue, the sufficiency of the allegations of a primary infringement under the Copyright Act. Instagram, the defendant here, is not alleged in the complaint to have been a primary infringer. They are alleged to have been a secondary infringer and an aider and a better. And they've raised no arguments about the sufficiency of the allegations of aiding and abetting a secondary liability. What we're concerned here with is did the complaint adequately allege a primary infringement violation. Now, the district court, Judge Breyer, said that we did not in a short order. Said that there was no finding that a primary infringement had occurred. But, in fact, that was completely erroneous. In the Southern District of New York, Plaintiff Hunley, the same plaintiff here, based on the same properly registered photograph, based on the same conduct, brought suit against the primary infringer, Buzzfeed, in the Southern District of New York. And that court determined that the claim was proper and upheld it and allowed it to proceed. And is this the court that disagreed with our decision in Perfect Ten? Yes. Yes. But I don't think Perfect Ten was cited, Your Honor, in the decision in the Buzzfeed case. And the district court's determination here that there was no underlying infringement by a third party, as stated on page 4 of his short opinion, is just flatly wrong. There was. And it's based on the same facts. Are you arguing there's some sort of estoppel with the Southern District of New York case, or is that just a side note? Well, no, I think it is an estoppel, but it also is something that the court should take judicial notice of, because that is the only appropriate form where the primary infringement claim could have been brought. The primary infringing actions that occurred here occurred within the Southern District of New York. Buzzfeed is headquartered and domiciled in that jurisdiction and in that district. This plaintiff, this photograph, these allegations. Well, there's no real collateral estoppel because Instagram was not a party to that claim. They're not a party to that claim. No, you're not arguing that's collateral estoppel. Well, it's not collateral estoppel, but I do think the court can judicially notice that fact. I think it's highly pertinent here. And that's the issue before the court here. That's the sole issue here. Is there a proper allegation of a primary infringement? And there was, and a court has upheld that. Now, the district court disregarded it, but this point was raised in the briefing. It was discussed in the underlying briefs that we submitted to the district court. The case was cited. And furthermore, the first amendment. But given the history of what the Southern District of New York has said about Perfect Ten, this just feels like this is a fair fight between the courts of the Second Circuit and the courts of the Ninth Circuit over Perfect Ten. Well, I don't know if I'm. . . How do we get around Perfect Ten? How can you get around Perfect Ten in this court? You got around it in New York. Congratulations. But that's just a fair fight. Well, I understand, Your Honor. And there is a distinction because this court's Perfect Ten analysis has not been adopted in any other court throughout the nation. Of course, one of the goals of the Copyright Act and stated in the Federalist Paper 43 is uniformity in application of these laws throughout the country. Now, I know there's a differentiation, a distinction in the law. It feels like we got there first, Counsel. Maybe the Second Circuit should have conceived that. Well, you did. But, Your Honor, you got there first in 2007 with regard to a case that was limited on its face, as the first sentence of Perfect Ten says, to the technology involving search engines. Instagram was not even in existence until 2010, and this embedding technology that's at issue here did not come into play until 2013. So our point on Perfect Ten would be that it should be limited to the facts of the case. Well, the thrust of your theory, is it not, is that basically you're arguing that Perfect Ten should be narrowed in light of recent Supreme Court authority. Correct? For example, what is it, American Broadcasting Company v. Arellano? I mean, that came in 2014. Yes. After Perfect Ten. So you're arguing that this Court should narrow Perfect Ten in light of subsequent jurisprudence. Your Honor, I think, and yes, that Arellano case in Decini is critical to this because the language there discusses how what matters is what the viewer sees and not the behind-the-scenes technology. But what I would say is we're just saying, we're not saying eliminate Perfect Ten. We're not even saying narrow it. We're saying do not expand it beyond its specific factual allegations. The factual allegations here are different. We've got the entire tech industry through Instagram and their amicus briefs saying Perfect Ten should apply to almost any scenario that one could dream up. Well, our facts are different. Yes, but Perfect Ten was trying to interpret the Copyright Act, so I don't understand how the Copyright Act would apply differently through different technologies, different websites, essentially. Well, Your Honor, first of all, there's nothing in the Copyright Act that suggests there needs to be possession or a copy on the part of the primary infringer to support a claim. So that's not even in the language of the statute. Well, it says it has to produce a copy of it, and it defines copy as something that's fixed, right? Yes, but what happens in the use of the embedding technology is you're in New York and you go on a website, and lo and behold, Ms. Hundley's photograph is right there, right there for you to view. And that direct infringer, which the Southern District of New York said, yes, they're a direct infringer, owes no compensation, has no liability if this court were to apply Perfect Ten to this situation, an anomalous situation where the primary claim's already been upheld by a court, a proper court, where the claim could only have been brought. So this contention by the district court that somehow we fail to allege a primary violation is on its face erroneous and requires reversal. Now, if Instagram wants to raise arguments about the application of Perfect Ten to its conduct as a secondary violator in the district court before Judge Breyer, that's well and good. We welcome it. We'll take it on. But the point is if we reach the threshold for dismissal, plausibility, plausibility, we have a federal court order that says it's a valid claim. And we've had no discovery. This is a de novo review. And we believe that we will be able to ---- If Perfect Ten applies and it applies across the board, not just to search engines, then there was no claim for direct infringement. Your Honor, were that scenario the case, I would have to say yes. But obviously we don't agree with that because the technology is different. This is not a search engine that we're talking about. We're not talking about sort of the library of the Internet here. But why is the technology different? It's almost exactly the same as what Google's doing, isn't it? Isn't it just, you know, embedding a URL to where the copyrighted material is housed or stored? What's happening here is that BuzzFeed and Time, the primary infringers, are not in any way analogous, I would suggest and submit to Google, because they are directly disseminating and profiting from the use and display of appellants of copyrighted works. Now, if you look at the decision of Perfect Ten, you'll see that it says, certainly in the section discussing the secondary liability claim, that there's no dispute that there were direct infringements here by other sort of unnamed parties that were displaying the nude photographs of the women that were at issue. So the case on its face makes clear, you know, that that part of the decision is not in dispute. You can't ignore the development of technology. And I don't think, as Judge Bennett pointed out, the Supreme Court says, don't get caught up in sort of the fineries of the underlying technology. You're going to hear all about that from my esteemed colleague here, expert in technology. But this is not a techie issue, with all respect. This is an issue of rights under the Copyright Act for monetizing, by third parties, valuable, properly registered photographs. And there's no reason in this situation, given the scenario that happened here, where we've got the primary claim upheld by a different court, that we shouldn't at least be allowed to test in the district court through discovery what happened here. We don't know where these servers are located. Roberts. Under that theory of not looking at what's beneath it all, how is there even an infringement here? Your client uploaded a copyrighted photo to Instagram, which clearly says that they will distribute it and embed it in other places. And so how is there even an infringement when your client did knowingly agree to all of this? Well, there's absolutely an infringement here, Your Honor. It turns on the specific terms of the Instagram license that was involved. It was a non-exclusive sub-license to Instagram to place that photo on the Instagram platform. In this day and age, that is almost something. Which includes an embedding function. It included an embedding function. So that's what I don't understand. Your client knew all of this going into it and agreed and uploaded the copyrighted photo. Your Honor, there was no agreement that a third-party website had a sub-license. Instagram made that crystal clear. Our complaint is explicit on this. Well, what's the purpose of embedding function if it's not to display it on a third party? Well, because it allows Instagram to draw eyeballs to its platform, which is the way it makes money. And, Your Honor, I want to make this very clear. There was no agreement whatsoever by Instagram to allow this to be shown on third-party website platforms. There was no sub-license. This complaint makes crystal clear. And they won't dispute this. They say this is a non-exclusive sub-license for Instagram only. And in the Ars Technica article, which we cited in our complaint, Facebook, the parent of Instagram, openly said that we are not saying that the third-party websites don't need to get sub-licenses. They acknowledge that they do. In open court, they acknowledge that they did. We cited the case where that happened in our complaint. So that's not an issue here. There is no sub-license that was granted to those third-party websites through the agreements with Instagram. All it allowed for was Instagram to show the photo on its platform. Again, something that in this day and age is absolutely essential for small artists. The embedding function, did that exist before your client uploaded the copyrighted photo? I'm sorry, Your Honor? The embedding function. Did that exist prior to your client uploading the photo? So the embedding function came into being in 2013. So, yes, yes, the embedding function did. This is a new technology. This is not a technology discussed in Google. It's not an analogous technology. It's not the library of the Internet. This is something that has allowed third parties, as recognized by the district court in the Hunley case, the same photograph, to profit improperly from usurping her display right and not allowing compensation for it. So in this situation where we have clearly, adequately alleged a primary violation, and that's the only issue before this Court. Have we adequately alleged that? Now, our complaint is chock-a-block full of the allegations of primary violation that were also found by the district court in New York to support the claim. So that's the issue. Now, Perfect 10 is a case from 2007 involving a search engine, and no one will dispute that there's been, I mean, we know the speed with which technology changes. You have to examine each case on its own facts. That's my question. If we were to agree with you and say that Perfect 10 shouldn't apply, what standard should we apply then? Well, you should look to the facts that have been appropriately alleged in our complaint and find that they fall outside of the search engine discussion. No, but yes, but then you're just saying get rid of the, you know, the stored tests, but what the server tests, what tests do you then apply? We're not saying get rid of the server tests, Your Honor. That is not our position. Okay. What test applies to your facts? Each case is different. This case, the facts that we alleged are what matters here, and this is not a search engine function that was applied. There was no volitional act required here to look at on the third-party website the picture. It's just there, and there were no licenses involved in Perfect 10, and as Instagram publicly stated, they did not allow this conduct to occur. So this is not a situation dealing with the Internet's library, with Google and the like, and I don't think that this Court should give its imprimatur to a decision to apply it to any manner of new technology that arises, including the new embed technology that is at issue in our case, which did not exist in 2007, and which every other court that has looked at this issue has said the server test shouldn't apply in this position with these allegations. We're not saying get rid of the server test. We're saying it should be limited to the facts of that case. Each court should look at the facts that are alleged, but it certainly shouldn't be expanded as the tech industry wants to every manner of technology. Thank you. I'll reserve my time. Thank you, counsel. Good morning, Your Honors. May it please the Court. I'm Joe Gratz with Morrison & Forrester, appearing for Instagram. Appellants think that Perfect Ten against Google, Perfect Ten against Amazon was wrongly decided, and that's the basis here. They make three arguments, but none of them is persuasive. And the first one, and we've heard a lot about this, is trying to distinguish Perfect Ten from the facts. And the big problem that appellants have here is what it says in the complaint. In the complaint in paragraph 35, page 16 of the excerpt of the record, they say that the embed code at issue here is a process, quote, legally indistinguishable from inline linking or other methods of providing HTML instructions for image retrieval. And Perfect Ten says what the technology it's talking about is inline linking. That's at page 1156. There's an image hosted on server A, and server B points to it. The server A, which is serving up the image, has engaged in a public display, and server B, that is just providing information, pointing to server A, has not engaged in a public display. And nothing about that rule has anything to do with search engines or social media or anything contextual. It has to do with something instead textual about what it means in the Copyright Act to display a work and to display a work publicly. And that this is not a contextual rule that is applicable only to search engines is something that we can see, for example, in this court's recent memorandum disposition in the EVOX against Verizon case. This was cited in the reply brief in footnote 8 and not discussed, but it's a decision from December of 2022 in which this court, NMM Dispo, applies the server test to something that is not a search engine. It's instead a site with information about cars. So that's why, Your Honors, this is not a case that can be decided by saying Perfect 10 is a rule for search engines. Perfect 10 is a rule applicable to a particular technology, and the complaint says that that technology is the same technology at issue here. Can I ask what's your reaction to your friend's argument that in New York there was a finding of direct infringement or primary infringement? So that is right, but it doesn't make any difference. And it doesn't make any difference because that finding is not binding at all on parties who weren't there. And we weren't there. And we couldn't have been there. And also I think it is important that you can't get around Ninth Circuit law, right? Ninth Circuit law is the bounds of the public display right are this. You can't get around Ninth Circuit law by going to a court that you think is going to apply a different rule, getting them to apply that different rule and saying, Look, I got a different court to apply a rule that a court in the Ninth Circuit wouldn't apply. Now you have to take all the consequences of that and apply Ninth Circuit law to those. You can't get around it just by sort of getting another court to do something that is, I think, inconsistent with Ninth Circuit law. And my second question is, what is Instagram's position on whether or not BuzzFeed and the like do need a sublicense to use the copyrighted material? The server test is correct, and they do not need a sublicense. Instagram has not taken the position in any court that the server test is wrong or inapplicable. In fact, as we noted in our brief, Facebook, which is Instagram's parent company, has taken the position in this court and in the Seventh Circuit that the server test is the correct rule and is broadly applicable for more than a decade, even before they purchased Instagram. So they did not need a sublicense to embed because the server test is correct. If the server test was not correct or was not applicable or if you were in some other jurisdiction that applied some different rule based on, in our view, an erroneous reading of the Copyright Act, that might be a relevant question. But it is certainly not a relevant question here or in the Seventh Circuit or anywhere else. So your argument is if the server test applies, necessarily these primary, like BuzzFeed, do not need a sublicense? That's right. Because the server test applies, because Perfect 10 applies, they aren't doing any copyright-relevant act relative to the phone. They are not transmitting or otherwise communicating it. They are not showing a copy of it. They are not meeting any of those. They're just pointing at it, pointing at someone else who can provide them with a display of it. And that's just not a copyright-relevant act in this circumstance, as a matter of at least direct infringement, as Perfect 10 says. And with respect to the jurisdictional question, then, Counsel, your point is that Perfect 10 can easily coexist with the Supreme Court's opinion in Aereo. It can, Your Honor, and here is why. In Aereo, the defendant, Aereo, argued that it wasn't performing, wasn't engaging in public performance, and it wasn't performing at all, even though its servers, Aereo's servers, were the ones transmitting the content. They had a copy, and they were transmitting the content. And in Aereo, the Supreme Court said, no, Aereo, you are performing, because your servers, Aereo, are sending out this transmission of the copyright. So there's performance, and the issue was the transmission rights, essentially. That's right. So the definition of public performance in Section 101 is, in relevant part, to transmit or otherwise communicate a performance or a display of the work, and that's what was happening in Aereo. And the person doing it was the one whose machine was sending the bits down the wire, who was making the – And your point is Perfect 10 deals, then, with the display right, not the transmission right, essentially. So Perfect 10 deals with the public performance right rather than the display right. I think here, though, I think they are closely related provisions, and in Perfect 10 – excuse me, in – Aereo. In Aereo. In Aereo, the public performance right was at issue, but the same definition of publicly was at issue, right? That is, the question is to who is transmitting or otherwise communicating the signal that constitutes the work. And in Aereo, you can't read it, I think, or shouldn't read it to be a general rule that you can't look under the hood, or if it quacks like a duck, it's a duck, because the Supreme Court was careful to say there that their ruling on that particular technology was based on their reading of the legislative history and its context with respect to broadcast technologies. Does the performance right have any fixation requirement like the display right? So to perform, the definition of to perform in Section 101 does not mention a copy. The definition of to display does mention a copy, to show a copy. That's right. I think that is one way of distinguishing between the two, and that's a way that I think was important to the Perfect 10 Court. They said, look, you need to be showing a copy, and if you haven't got one, you can't do it. I think in this context, that's right. I want to note there are a couple of different ways of textually getting there. In addition to that one, which is in the main text, there's the to use the definition of publicly, which is in footnote 7 of Perfect 10, which doesn't have the same connection to needing to possess a copy, which is what the Southern District of New York seems to have a problem with. None of them are talking about the other holding in Perfect 10, which is that to communicate instructions about how to go find something is not to communicate that thing. The text says you need to be transmitting or otherwise communicating a display of the work, and you are not communicating something just by telling somebody where they could go get it somewhere else. For example, if I tell you to go to the Louvre, I haven't just communicated the Mona Lisa to you. If I tell you to load the Wall Street Journal's website, I haven't just displayed a picture of Elon Musk. If I say buy a newspaper in a week, I haven't just communicated to you who's going to win the Super Bowl. You can't communicate something if you haven't got it in some way. And BuzzFeed here didn't have it. They just had the embed code that was a pointer to it. And so, Your Honors, I just want to focus on the statutory text that this comports with. It's consistent with Aereo, and I think most importantly here, this is the unambiguous holding of this court in the Perfect 10 case. Returning for a second to Perfect 10, one of the things that we heard from Mr. Serra was that this was a ruling that was sort of focused on search engines. And I think the last point I want to make is it isn't just that they were talking about search engines because that was the context, but this is a rule that applies more generally. I think that's true, but I also want to note they announced this in Perfect 10 as a general rule without talking about the particular parties or particular technologies at issue. They say on page 1161, a computer owner, not a search engine, not a particular kind of computer owner, but a computer owner does not display a copy of an image when it communicates only the HTML address of the copy. Everybody agrees that is what happened here, and for that reason, Your Honors, this case is, in our view, controlled directly by Perfect 10. I would be happy to answer any other questions that the panel has. Otherwise, I will yield. Okay. Looks like we're out of questions. Thank you, Counsel. Thank you. Your Honors, I come back to the fact that social media did not exist at the time that Perfect 10 was decided, and you can't have a blind eye to the impact of what new technologies might provide. Now, the fact is e-box that they cited, that was a storage case, again, a storage case within Perfect 10. This is not a storage case. This is a case about what the viewer is seeing based on the conduct of the third party. The third party's conduct here, as noted, upheld as a proper infringement claim, direct infringement claim. Aereo says you don't look at the technical distinctions invisible to the user. You look at what the user believed they were seeing. The fact that the third party had the photo available to show without compensation here is a direct result of the embed technology nonexistent at the time of Perfect 10. The fact that Instagram wasn't present in the case in New York when the primary infringement claim was decided in favor of the plaintiff is an irrelevance. There was no obligation for them to be there, and now they have a full opportunity to present, as obviously is the case here, a complete defense to the case. So the server test says nothing about needs for a sublicense, and it is silent, of course, on the embedding technology that is at issue here. Here we're talking about acts of third parties that allowed this display to occur, to people who are reliant on this for their unique works of art to be compensated. The display right and the transmission right, Judge Bennett, are essentially the same in terms of their analysis under the law. There's really no distinction, as it may be important here. The display right talks about showing a copy of the infringed material, not the copy. So it's just a general term that there has to be a copy displayed, not the copy, and it says nothing about possession. There's nothing in the Copyright Act that says you have to have possession, and here we have the third party already determined to be a primary infringer showing the photo without compensation. Your Honor, we are not asking to undo Perfect 10. Perfect 10 is fine insofar as the technologies at issue were discussed in that case we're concerned. It's a 2007 case. The world, as we all know, is moving extremely fast. The facts of each case need to be evaluated on their own merits. Here we have a unique situation where the primary infringement claim has already been upheld, and it would be an injustice not to at least allow discovery to proceed in this case. After all, this is a de novo review. It's a motion to dismiss. It would be an injustice to not allow further exploration of discovery as to the servers, where they were, who had possession of what. We don't even have that level of detail here because we haven't gone to discovery, but in light of the ruling of the Southern District, this is a plausible claim. This is a plausible claim, and there's been no challenge to the sufficiency of the aiding and abetting secondary liability allegations against Instagram. We should be allowed to proceed to discovery. Thank you, Your Honors. Thank you, Counsel. This case is submitted, and we will take a short five-minute recess. All rise.
judges: BYBEE, BUMATAY, Bennett